UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASON  HALTOM Trustee, | ) | |
| INDIANA ELECTRICAL WORKERS | ) | |
| PENSION BENEFIT FUND, | ) | |
| JAMES  TSAREFF, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TIERNAN & HOOVER, INC. doing business | ) | No. 1:10-cv-00980-SEB-DKL |
| as THE FREIJE COMPANY, | ) | |
| MANWEB SERVICES Formerly d/b/a | ) | |
| Enterprise Electric & Mechanical and d/b/a | ) | |
| Freije Engineering Solutions, | ) | |
| ENTERPRISE ELECTRICAL & | ) | |
| MECHANICAL CO., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff James Tsareff, as a trustee of Indiana Electrical Workers Pension Benefit Fund

("the Plan"), filed this action pursuant to 29 U.S.C. § 1301(a)(10) to collect on the withdrawal

liability allegedly owed by Defendants Tiernan & Hoover and ManWeb Services Inc.

("ManWeb"), as authorized by Section 502(a)(3), (e)(1) and (f) of the Employment Retirement

Income Security Act ("ERISA"), Section 301(a) of the Labor Management Relations Act of

1947 ("LMRA") and the Multi-Employer Pension Plan Amendments Act of 1980 ("MPPAA").[1]

---

[1] As discussed in much greater detail below, withdrawal liability is provided for in the MPPAA and is meant to protect employees in multiemployer pension plans by requiring employers who "withdraw" from such plans to pay their share of "unfunded vested benefits."  29 U.S.C. § 1381(b)(1).

This cause is currently before the Court on cross motions for summary judgment filed on behalf of the Plan [Dkt. No. 95] and ManWeb [Dkt. No. 104].[2]

## Factual Background

The facts pertinent to our resolution of the parties' motions are largely undisputed. However, where necessary, we note the parties' varying interpretations of the facts presented to the Court.

### A.    The Parties

The Plan is a multiemployer pension plan that provides retirement benefits to employees under a collective bargaining agreement ("CBA"). Jason Haltom and James Tsareff are trustees of the Plan and have brought this lawsuit on its behalf.

Tiernan & Hoover was a privately owned company based in the Indianapolis area that performed engineering, construction, and service for cold storage facilities. Tiernan & Hoover

---

[2] ManWeb also filed a motion requesting leave to file a supplemental surreply [Dkt. No. 141] in light of "new" arguments raised in the Plan's Reply to Tiernan & Hoover, Inc.'s Brief in Opposition to Plaintiffs' Motion for Summary Judgment (the "Plan's Reply to Tiernan & Hoover") (Dkt. No. 136). Specifically, ManWeb maintains that the Plan concedes for the first time in that filing that withdrawal liability arose only after the closing of the asset purchase, in contrast to the Plan's prior position that Tiernan & Hoover's withdrawal liability was always in existence by virtue of Tiernan & Hoover's participation in an underfunded multiemployer defined benefit plan. ManWeb's argument appears to be based on the following heading in the Plan's Reply to Tiernan & Hoover: ""Withdrawal Liability Can Occur After an Employer Sells its Assets and in Fact Did Occur After Sale in this Case." The Plan opposes ManWeb's request claiming that the inclusion of the word "Liability" was a scrivener's error and that its theory that "withdrawal," as opposed to "withdrawal liability" could occur after the asset purchase is consistent with its prior filings. We do not find ManWeb's argument convincing. The text of the paragraph under the quoted heading supports the Plan's position that the inclusion of the word "Liability" was a mistake. Furthermore, the issues of when withdrawal occurred and when and if liability for that alleged withdrawal arose are central to the parties' voluminous filings related to these cross motions for summary judgment. ManWeb has had the opportunity to respond adequately to the Plan's assertions related to these issues. See Dkt. No 117 at 21-22; Dkt. No. 131 at 11 ("ManWeb cannot be a successor to Tiernan & Hoover because, as a matter of law, the alleged withdrawal liability incurred by Tiernan & Hoover—if it ever existed at all—did not arise until after the closing on the Asset Purchase Agreement."). Thus, ManWeb's request to file a surreply [Dkt. No. 141] is DENIED.

ManWeb also filed an Unopposed Motion for Oral Argument on Summary Judgment Motions [Dkt. No. 126]. Because the Court is able to resolve the motions for summary judgment based on the parties' briefs, oral argument is unnecessary and ManWeb's request is DENIED.

was established in 1997 when the company purchased the assets of William F. Freije, Inc.  Both William F. Frieje, Inc. and Tiernan & Hoover did business under the name "The Frieje Company."  Michael Hoover was the President of Tiernan & Hoover in August 2009.  Greg Taylor was a Vice President and partial owner of the company.[3]  Over the course of its existence, Tiernan & Hoover employed between 30 and 130 employees comprised of various office and field personnel.  Tiernan & Hoover was a party to a CBA with IBEW Local 481 Union (the "Union") in accordance with which it made contributions to the Plan on behalf of its field production electricians covering the hours they worked.  Tiernan & Hoover was considered a construction industry employer for purposes of ERISA because its work was performed primarily in the construction industry.  The company's address was 6450 Guion Road, Indianapolis, Indiana 46268.

ManWeb is an Indianapolis-based company founded in 2003 by Charles Mandrell and Michael Webster.  The company performs engineering, construction, installation, and other services.  Over the course of its existence, ManWeb employed between 100 and 450 employees.  During the time relevant to this lawsuit, ManWeb's address was 9211 Castlegate Drive, Indianapolis, Indiana 46256.  ManWeb was and is a non-union affiliated employer who never made contributions to the Plan.  The company did business as Enterprise Electrical and Mechanical Company until the latter half of 2010.  In July 2010, ManWeb underwent a reorganization transferring its construction business to a newly formed subsidiary.  At the same time, what remained of the company began doing business as "Frieje Engineered Solutions."

**B.      The Asset Purchase**

---

[3] The Plan claims that Taylor worked in sales and marketing in August 2009.  However, this potential dispute regarding Taylor's position or specific duties at Tiernan & Hoover is inconsequential to our resolution of the parties' motions.

Sometime in early 2009, Webster and Mandrell on behalf of ManWeb entered into negotiations with Hoover for the purchase of selected assets of Tiernan & Hoover.  One reason ManWeb chose to pursue Tiernan & Hoover was because of that company's position in the industrial refrigeration market.  Webster and Mandrell were aware that Tiernan & Hoover was a union-affiliated employer.  Mandrell testified that there were numerous discussions regarding Tiernan & Hoover's union obligations, specifically with regard to the possibility of "under-funded pension liability," prior to the asset purchase and that he was concerned about potential liabilities stemming from those obligations. Webster concurred that discussions regarding Tiernan & Hoover's "unfunded pension" occurred as a part of their negotiations of the asset purchase but that he was never aware of any withdrawal liability obligation on the part of Tiernan & Hoover.  Webster Dep. at 66-69.  Mandrell testified that he was aware of the concept of withdrawal liability based on his former work as a union contractor.  Mandrell Dep. at 57. However, he also testified that he was unclear on the difference between withdrawal liability and "an under-funded portion of the pension fund."  Id. at 59.

In August 2009, Tiernan & Hoover entered into an Asset Purchase Agreement (the "Agreement") with ManWeb pursuant to which ManWeb purchased "all of the assets, rights and properties owned, used or held for use by [Tiernan & Hoover] at the Closing in connection with the Business."[4]  The Agreement also detailed the liabilities of Tiernan & Hoover that were assumed by ManWeb and those for which it assumed no liability.  Agreement §§ 1.3, 1.4.  Any liability "arising out of or related to union obligations, to include pension related obligations" was specifically referenced as an "excluded liability."  Before the closing of the transaction, Tiernan & Hoover's attorney specifically noted this portion of the Agreement to Hoover and Taylor to ensure that it was consistent with their expectations.  Hoover passed along the

---

[4] The Agreement lists those assets included and excluded from the purchase.

attorney's comments to Mike Webster, as well.   Tiernan & Hoover further represented to

ManWeb that it had not incurred any withdrawal liability to any multiemployer plan.  Agreement

§ 5.1(m).

The Agreement detailed a "wind down" process providing that, after closing, Tiernan &

Hoover was to "wind down its business operations and carry out an orderly disposition of all of

its remaining assets as quickly as commercially reasonable."  Pursuant to the Agreement,

Tiernan & Hoover agreed to use the funds generated from these "Wind Down Activities" to "pay

its outstanding financial obligations."  Following the sale of its assets, Tiernan & Hoover ceased

operations entirely.

After acquiring these assets, ManWeb performed industrial service and construction,

industrial refrigeration, engineering, HVAC, refrigeration, plumbing and electrical work, taking

over Tiernan & Hoover's work in progress and warranties pursuant to the Agreement.  Several of

Tiernan & Hoover's former customers became ManWeb customers.  The Plan asserts that

ManWeb "continued to do the same type of work" as Tiernan & Hoover, but ManWeb maintains

that it provides a far broader range of services than Tiernan & Hoover ever did.

Following the asset purchase, ManWeb filed a Certificate of Assumed Business Name

with the Indiana Secretary of State stating that ManWeb would "be doing business under the

assumed business name(s) of: The Frieje Company."  Pl.'s Ex. 14.   Webster, however, testified

that ManWeb has never done business as the Frieje Company.  Webster Aff. ¶ 20.  ManWeb also

began using Tiernan & Hoover's website which received visits coming to

www.freijecompany.com and linked them to ManWeb's own website.  These web links

continued until the latter half of 2010, when ManWeb reorganized.  ManWeb utilized both its

own logo as well as The Freije Company's on company letterhead for a period of time following the asset purchase.

Hoover, Taylor, and Dick Freije, another of Tiernan & Hoover's original owners and a Mechanical/Refrigeration Engineer, worked for ManWeb following the asset purchase. Hoover testified that his position at ManWeb was "as a salesperson, account manager, and engineer with a primary focus on the industrial refrigeration market." Hoover Aff. ¶ 1. Taylor testified that he was the "direct owner business development manager" at ManWeb. Taylor Aff. ¶ 1-2. Freije worked as a Refrigeration Engineer at ManWeb.[5] ManWeb also hired thirteen of the approximately 35-40 employees who were working for Tiernan & Hoover on the day of the asset purchase closing. None of these employees was an electrician for whom Tiernan & Hoover had paid contributions to the Plan. Tiernan & Hoover's former electricians transferred to a company called Omega Electric Company. Webster Dep. at 84. ManWeb did not make any contributions to the Plan following its purchase of the Tiernan & Hoover assets.

### C.   Tiernan & Hoover's Withdrawal Liability

On February 24, 2010, a letter from counsel for the Plan addressed to "The Freije Company," the business trade name of Tiernan & Hoover, was sent to that company's former address, 6450 Guion Road.[6] See Pl.'s Ex. 26 ("the Letter"). This was the address the Plan had on file according to its Plan Administrator, Robert Cadwell. Cadwell Aff. ¶ 9. The Letter conveyed a formal demand for payment of withdrawal liability in the amount of $661,978.00. Hoover had directed the United States Postal Service to forward any mail addressed to "The

---

[5] The parties dispute whether Freije is or was also a Director at ManWeb, however, this dispute is inconsequential to our resolution of the parties' motions.

[6] The Plan attached a copy of this correspondence to its memorandum. [Dkt No. 98, Ex. 26]. ManWeb argued that the document was inadmissible because of Plaintiffs' failure to authenticate the letter. However, ManWeb designated a copy of the letter as well as an Exhibit to its own Motion for Judgment as a Matter of Law. [Dkt. No. 106, Ex. P]. Therefore, we consider ManWeb's challenge to the authenticity of the exhibit waived.

Freije Company" to ManWeb's address at 9211 Castlegate Drive.  Hoover Dep. at 76.  However,

mail addressed to "Tiernan & Hoover" was to be retained at the 6450 Guion Road location.  Id.

ManWeb employee Sharon Giles received and signed for the Letter at the Castlegate location.

Pl.'s Ex. 27.  Although ManWeb and Tiernan & Hoover maintain in their briefs opposing the

Plan's Motion that the Letter was never actually sent to Tiernan & Hoover, ManWeb's

Memorandum in Support of its own Summary Judgment Motion concedes that an attorney

representing the Plan sent the Letter to the 6450 Guion Road address and the receipt of that

Letter by Ms. Giles.  ManWeb Mem. at 12.  Thus, there appears to be no dispute between the

parties over whether the Letter was actually *sent* by the Plan's attorney.

Tiernan & Hoover and ManWeb do contend, however, that no ManWeb employee was

ever authorized to receive mail addressed either to Tiernan & Hoover or The Freije Company.

No explanation has been provided to us regarding the process for forwarding mail delivered to

Tiernan & Hoover's Guion Road address or for handling the Letter after it was signed for by Ms.

Giles.  Regardless, both Hoover and Taylor have testified under oath that neither was aware of

the Letter until the Complaint in this litigation was filed and the Plan does not dispute this fact.

The Letter, as previously noted, informed The Frieje Company that based on its

withdrawal from the Plan in August 2009, the Plan had assessed Tiernan & Hoover's "unfunded

vested liability" to be the amount of $661,978.00.  The demand specified that payment must

commence within 60 days of the Letter's receipt.[7]

No payments have ever been made to satisfy this liability; further, Tiernan & Hoover

never sought a review of the assessed withdrawal liability or initiated arbitration or otherwise

---

[7] The Plan alleges that a notice of default was sent to Tiernan & Hoover on June 11, 2010.  [Dkt. No. 98, Ex. 30].
ManWeb disputes that this notice was sent to it and further that the Plan failed to properly authenticate the
exhibit.  Because this notice is irrelevant to our consideration of the parties' cross motions, and does not create a
genuine issue of "material" fact, we decline to rule on its admissibility.

challenged the assessment.  The first indication of such a challenge to the assessment came in

Tiernan & Hoover's Answer to this lawsuit, filed *pro se*, which provided as follows:

> Tiernan and Hoover, Inc. sold its assets as a result of its debt situation.  All
> monies from the asset sale were immediately used to pay for secured bank debt.
> Tiernan and Hoover, Inc. has additional secured liabilities that it is unable to
> cover.  Tiernan and Hoover, Inc. have turned over all cash and cash equivalents to
> its respective banking institutions and therefore do not have the means to support
> active counsel for handling this company.  Further, Tiernan and Hoover, Inc. do
> not have the means to properly dissolve the corporation in a timely and efficient
> manner and is waiting on the State of Indiana to administratively dissolve the
> corporation.

### Legal Analysis

### A.    Applicable Legal Standard

As noted above, the Plan and ManWeb have filed cross motions for summary judgment.

Summary judgment is appropriate when the record shows that there is "no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in

a light most favorable to the non-moving party and draws all reasonable inferences in favor of

the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505,

91 L. Ed. 2d 202 (1986).  Because these are cross-motions for summary judgment regarding

which the same Rule 56 standards apply, our review of the record requires us to draw all

inferences in favor of the party against whom a particular issue in the motion under consideration

is asserted.  See O'Regan v. Arbitration Forums, Inc., 246 F.3d 975, 983 (7th Cir. 2001) (citing

Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 692 (7th Cir. 1998)).

### B.    Discussion

The Plan contends that it is entitled to summary judgment against Tiernan & Hoover because it has established that Tiernan & Hoover effectuated a complete withdrawal, that withdrawal liability was properly assessed, and that Tiernan & Hoover is no longer entitled to initiate arbitration or to put forth any other defenses to withdrawal liability.  The Plan also contends that it is entitled to summary judgment against ManWeb because ManWeb is a successor to Tiernan & Hoover.  Both Tiernan & Hoover and ManWeb oppose the Plan's Motion and, indeed, ManWeb requests summary judgment in its own favor.[8]  We discuss the Plan's claims against both Defendants below.

As an initial matter, some background related to withdrawal liability and its purpose within the ERISA framework seems worthwhile.  The Seventh Circuit has provided the following guidance with regard to actions by multi-employer pension plans, such as the Plan in this case, to collect withdrawal liability from employers:

> The MPPAA protects employees in multiemployer pension plans by requiring employers who withdraw from such plans to pay their share of "unfunded vested benefits."  29 U.S.C. § 1381(b)(1). This is known as "withdrawal liability."  When an employer withdraws, the plan sponsor calculates the amount of liability and, "[a]s soon as practicable," notifies the employer of the liability and demands payment.  29 U.S.C. § 1399(b)(1).  This "notice and demand" must include the amount of liability and a schedule of installment payments.  When the employer receives the notice, it must begin paying according to the schedule.  See Robbins v. Pepsi-Cola Metro. Bottling Co., 800 F.2d 641, 642-43 (7th Cir. 1986) (per curiam).  The statute places a premium on prompt payment; it is a "pay now, dispute later" scheme.  Id. at 642.  But the withdrawing employer "owes nothing" until the plan notifies it of its liability and demands payment.  Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co., 513 U.S. 414, 423, 115 S. Ct. 981, 130 L. Ed. 2d 932 (1985).

---

[8] While Tiernan & Hoover requests summary judgment in its Response brief to the Plan's Motion, it did not file a Motion specifically seeking such relief.  Any such request should have been submitted months before Tiernan & Hoover's Response brief was submitted, pursuant to the Case Management deadlines set by the magistrate judge. See Dkt. No. 76.  Thus, we do not treat Tiernan & Hoover's Response to Plaintiffs' Motion as a cross motion for summary judgment.

Chicago Truck Drivers v. El Paso CGP Co., 525 F.3d 591, 595-596 (7th Cir. 2008).  The employer is not without recourse, but if the employer does elect to challenge the plan sponsor's assessment of its liability, it must request a review and initiate arbitration.  Id.  Failure to do so in accordance with the statutory deadlines results in the assessment becoming immediately "due and owing."  Id. (quoting 29 U.S.C. § 1401(b)(1)).[9]

### A.    The Plan's Claim for Withdrawal Liability Against Tiernan & Hoover

In light of the statutory requirement that the employer initiate arbitration, all that the Plan must show to prevail on its claim against Tiernan & Hoover at this point is that: (1) the Plan was a multiemployer pension plan, pursuant to the MPPAA, and Tiernan & Hoover was an employer for the purposes of ERISA; (2) the Plan notified Tiernan & Hoover of its assessed withdrawal liability; and (3) Tiernan & Hoover failed to timely initiate arbitration.  Hancock v. Cook County Waste & Recycling, Inc., No. 09-cv-212, 2010 U.S. Dist. LEXIS 33351, at *19 (N.D. Ill. Apr. 5, 2010) (citing El Paso CGP Co., 525 F.3d at 598).  There is no dispute that the Plan is a multiemployer pension plan to which the MPPAA applies, that Tiernan & Hoover was an employer pursuant to ERISA, or that Tiernan & Hoover never initiated arbitration to challenge the plan sponsor's assessment of its withdrawal liability.  Thus, our discussion focuses simply on the sufficiency and timing of the notice provided to Tiernan & Hoover of its assessed liability.

---

[9] "Exceptions to the arbitration requirement are made only in the rarest cases."  El Paso CGP Co., 525 F.3d at 595. Indeed, the only case our research has disclosed in which such an exception was made was one in which the parties specifically agreed to have the employer's constitutional challenge to withdrawal liability handled by the district court following arbitration.  Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc., 181 F.3d 799, 805 (7th Cir. 1999).  Some district courts have also tolled the deadline for initiating arbitration.  See e.g., Banner Industries, Inc. v. Central States, Southeast & Southwest Areas Pension Fund, 875 F.2d 1285, 1294 (7th Cir. 1989) (upholding a district court's decision to toll the statutory time frame during which arbitration may be initiated due to the employer's filing of suit in federal court).  However, such tolling is not justified where, as here, Tiernan & Hoover waited until it was sued to proffer any challenge whatsoever to the assessed withdrawal liability and has, to date, still never initiated arbitration.  Central States, Southeast & Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1377 (7th Cir. 1992).

Pursuant to 29 U.S.C. § 1382, the plan sponsor is to determine the amount of the employer's withdrawal liability, notify that employer, and collect the amount of withdrawal liability from the employer.  "In order to satisfy the statutory requirements, a notice and demand must include the amount of the liability, a schedule of payments and a demand for payment; it must also be sent 'to the employer.'" El Paso CGP Co., 525 F.3d at 598 (citing 29 U.S.C. § 1399(b)).[10]  The Seventh Circuit acknowledges that it has been "indulgent about the specific form that notice" can take.  El Paso CGP Co., 525 F.3d at 598.  All businesses under common control constitute a "control group" and are treated as a single employer for purposes of determining whether notice has been sufficiently provided.  29 U.S.C. § 1301(b)(1); El Paso CGP Co., 525 F.3d at 596.  No later than 90 days following the date the employer "receives" the notice, the employer may request that the plan sponsor review the assessment, and the plan sponsor must respond "after a reasonable review of any matter raised."  29 U.S.C. 1399(b)(2). The employer must initiate arbitration within either 60 days after the date the employer responds to the employer's request for review or within 120 days after the employer's request.  29 U.S.C. 1401(a).

Tiernan & Hoover maintains that the February 26, 2010 correspondence did not provide adequate notice of its liability because the company was no longer doing business at that address and both Hoover and Taylor deny having received that correspondence prior to the filing of this

---

[10] 29 U.S.C. 1399(b)(1) provides:

    (1) As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall--
       (A) notify the employer of--
        (i) the amount of the liability, and
        (ii) the schedule for liability payments, and
       (B) demand payment in accordance with the schedule.

lawsuit.  Taylor Dep. at 31-32; Hoover Aff. ¶ 14.  The Plan proffers no evidence to dispute that contention.

The parties have cited no case law addressing whether the MPPAA requires that a pension fund provide actual notice to the employer of its liability as opposed to providing constructive notice by sending notification to the employer's last address of record.  We note that 29 U.S.C. § 1399(b)(2)(A) uses the word "receives" to mark the beginning of the period during which an employer must challenge the assessment.  Furthermore, the Seventh Circuit has questioned the fairness of finding constructive notice sufficient for purposes of notifying a former owner who is no longer a member of the business "control group" referenced above.  El Paso CGP Co., 525 F.3d at 600 ("We question the equity of denying a former owner the right to contest liability because it failed to respond to a notice sent to a company from which it was already separated.")

Even if we assume the insufficiency of the initial notice, however, Tiernan & Hoover has conceded that it did in fact receive notice of the assessment as of the time the Plan filed its Complaint.  Dkt. No. 132 at 5.  That Complaint included allegations as to both the notice and the amount of the withdrawal liability claimed, to wit, $661,978.00.[11]  Tiernan & Hoover thus received actual notice of the Plan's claim for liability as of that date (August 2, 2010), which triggered the duty to arbitrate.  See El Paso CGP Co., 525 F.3d at 600 (finding that the employer's eventual receipt of the claimant's proof of claim in bankruptcy action served as actual notice of the withdrawal liability claim and triggered the employer's statutory duty to

---

[11] Any challenge to the sufficiency of the notice provided by the Complaint is also a matter that should have been submitted to the arbitrator.  See Chi. Truck Drivers, Helpers, & Warehouse Workers Union Pension Fund v. Loyal Casket Co., No. 06 C 5987, 2008 U.S. Dist. LEXIS 27832 (N.D. Ill. Apr. 7, 2008).  Because no challenge was challenged, any potential challenge has been waived.

arbitrate despite deficiencies in earlier attempts to provide the employer with notice of the claim); Central States, Southeast & Southwest Areas Pension Fund v. Royal Transp., No. 96 C 3641, 1997 U.S. Dist. LEXIS 7093, at*5 (N.D. Ill. May 13, 1997) ("Even if the notice to [the employer] were insufficient, service of the present complaint would serve as sufficient notice."). Tiernan & Hoover, however, has not availed itself of the opportunity to benefit from the statutory protection otherwise afforded had it initiated an arbitration.

Accordingly, we conclude that no genuine issue of material fact exists respecting the Plan's having provided Tiernan & Hoover with actual notice of its liability claim as of August 2, 2010, when the Complaint was filed.  Having failed to request a review and to initiate arbitration, Tiernan & Hoover has waived its right to dispute the assessment of liability.  The assessment thus is now due and owing.  Furthermore, the Plan is now entitled to accelerated payment of the $661,978.00 withdrawal liability, Chicago Truck Drivers, Helpers and Warehouse Union (Independent) Pension v. Century Motor Freight, Inc., 125 F.3d 526, 534 (7th Cir. 1997), as well as interest, liquidated damages, reasonable attorney's fees and costs pursuant to the MPPAA. See 29 U.S.C. § 1132(g)(2).  The Plan's Motion for Summary Judgment is GRANTED as to Tiernan & Hoover.

### B.    Plaintiff's Claim for Successor Liability Against ManWeb

The Plan also seeks to hold ManWeb liable for the withdrawal liability assessed against Tiernan & Hoover under the equitable doctrine of successor liability.  "[T]he entire notion of "successor liability" in the ERISA withdrawal context [is to give] employee benefit funds a second and added source to look to if and to the extent that the statutory liability of the withdrawing employer would otherwise leave the fund holding the bag."  Cent. States v. King

Chrysler Jeep, Inc., No. 09 C 7474, 2010 U.S. Dist. LEXIS 26176, at*4 (N.D. Ill. Mar. 19, 2010).  The Seventh Circuit has described the successorship doctrine in a case brought to recover delinquent pension fund payments and impose ERISA withdrawal liability, as follows:

> The successorship doctrine provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities. Most states have adopted exceptions to the general no-liability rule that allow creditors to pursue the successor if the "sale" is merely a merger or some other type of corporate reorganization that leaves real ownership unchanged.  Successor liability under federal common law is broader still: in order to protect federal rights or effectuate federal policies, this theory allows lawsuits against even a genuinely distinct purchaser of a business if (1) the successor had notice of the claim before the acquisition; and (2) there was "substantial continuity in the operation of the business before and after the sale."  Successor liability is an equitable doctrine, not an inflexible command, and "in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."

Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc., 59 F.3d 48, 49 (7th Cir. 1995)(internal citations omitted).

As noted above, a successor must have notice of its predecessor's liability in order for that liability to be imposed on the successor.  Tasemkim, Inc., 59 F.3d at 49; Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1329 (7th Cir. 1990). "Notice can be proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances."  920 F.2d at 1329.  "When the successor company knows about its predecessor's liability, knows the precise extent of that liability, and knows that the predecessor itself would not be able to pay a judgment obtained against it, the presumption should be in favor of successor liability, even if the successor . . . purchased the assets of its predecessor rather than

merged the predecessor into it or consolidated with it." E.E.O.C. v. Vucitech, 842 F.2d 936, 945 (7th Cir. 1988).

However, the Seventh Circuit has characterized the element of prior notice to an alleged successor as "critical," noting "it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser . . . when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." Musikiwamba v. ESSI, Inc., 760 F.2d 740, 750 (7th Cir. 1985). The economic rationale for successor liability goes as follows: "The successor, if he knows of his potential liability, will demand compensation in the form of a lower price for the assets, and in this way the burden of liability will be shifted back to the owners of those assets, where it belongs." Artistic Furniture, 920 F.2d at 1327 (quoting Vucitech, 842 F.2d at 945).

Here, the asset purchase whereby ManWeb acquired the assets from Tiernan & Hoover occurred several months prior to Tiernan & Hoover's receipt of the notice of withdrawal liability. Thus, we have serious doubts regarding the extent to which ManWeb could have had notice of the withdrawal liability prior to that acquisition. The parties argue extensively over this point. The Court in Tasemkim expressly stated that the successor must have had notice of the claim "before the acquisition" in order to impose liability upon it. 59 F.3d 48, 49. Because Tiernan & Hoover did not withdraw or incur withdrawal liability until after the asset purchase, ManWeb's position is that it is impossible for it to have had notice of an *existing* liability in advance of the closing on the asset purchase. Chicago Dist. Council of Carpenters Pension Fund v. A.F. McCarthy, Elite Plastering Co., 603 F. Supp. 2d 1143 (N.D. Ill. 2009). We agree with ManWeb on this point. The cases cited by the Plan for its position that the notice element encompasses both existing and potential liabilities involve situations in which a claim was at

least pending against the predecessor, <u>Golden State Bottling Co., Inc. v. NLRB</u>, 414 U.S. 168,

185 (1973) (acknowledging a successor's potential liability stemming from a pending unfair

labor practice charge); <u>Musikiwamba</u>, 760 F.2d at 751; <u>Goodpaster v. ECP Am. Steel, LLC</u>,

2012 U.S. Dist. LEXIS 152593, 2-3 (N.D. Ind. Oct. 24, 2012), or discuss potential liability on

the part of a *buyer*, not the seller.  <u>Artistic Furniture</u>, 920 F.2d at 1327; <u>Vucitech</u>, 842 F.2d at

945.

Even if we assumed that the Plan was correct, however, with regard to imposing liability

on a successor based on its knowledge of a hypothetical, potential claim against the predecessor,

this would not be a case in which imposing such liability would be equitable.  As discussed

above, Tiernan & Hoover waived all defenses that would otherwise have been available to it by

failing to initiate arbitration within the applicable statutory period.  Thus, pursuant to 29 U.S.C. §

1401(b)(1), the assessment is now "due and owing" regardless of any merits-based defense that

might have been available to Tiernan & Hoover.  However, if Tiernan & Hoover's waiver of its

defenses is the only basis upon which it is liable for the withdrawal, then instead of establishing

ManWeb's notice of Tiernan & Hoover's withdrawal liability based on the merits, the Plan

would have to establish notice of the events that led to Tiernan & Hoover's waiver and only then

resulting liability – an impossibility given that the timing of that notice to ManWeb would need

to pre-date the asset purchase, which occurred several months before Tiernan & Hoover itself

was provided with notice of its withdrawal liability.[12]  Thus, we return briefly to the issue of

Tiernan & Hoover's underlying liability.

---

[12] As a point of clarification, the Plan seeks to hold ManWeb liable pursuant to the equitable doctrine of successor
liability, not as a member of the same control group as Tiernan & Hoover.  As such, notice to Tiernan & Hoover is
not automatically imputed to ManWeb.

Putting aside the issue of waiver, the Plan bases its substantive claim of entitlement to withdrawal liability on Tiernan & Hoover's complete withdrawal pursuant to 29 U.S.C. § 1383(b).  In general, a complete withdrawal occurs when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan.  29 U.S.C. § 1383(a).  However, the statute provides a partial exemption for employers in the building and construction industry.  Specifically, 29 U.S.C. § 1383(b) states that an employer in the construction industry effectuates a complete withdrawal (and, thus, incurs withdrawal liability) only when:

> (A) an employer ceases to have an obligation to contribute under the plan, and
> (B) the employer –
>
>> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
>>
>> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

All of the parties agree that Tiernan & Hoover is an employer in the construction industry, Tiernan & Hoover and thus subject to § 1383(b).  Further, all agree that Tiernan & Hoover ceased to have an obligation to contribute to the Plan when the asset sale occurred and once it ceased operations.  However, the parties do not agree on the issue of whether a complete withdrawal occurred pursuant to SubPart (B), *supra*.  The Plan argues that *ManWeb's* continued performance of work of the type for which contributions were previously required of Tiernan & Hoover serves to impose withdrawal liability on Tiernan & Hoover.  We disagree.

Rather than citing cases construing 29 U.S.C. 1383(b), the Plan bases its argument on a test for successor liability as laid out in <u>Fall River Dyeing & Finishing Corp. v. NLRB</u>, 482 U.S. 27, 43 (1987).  The Court endorsed that test, referred to as the "substantial continuity" approach,

as a method to determine "whether a new company was indeed the successor to the old." Id. The Plan's reliance on the doctrine of successor liability in support of this conclusion ignores the fact that no successor liability exists without a prior determination that Tiernan & Hoover is liable to the Plan. See Richland Industries, Ltd. v. Robbins, No. 84 C 10105, 617 F. Supp. 639, 642 (N.D. Ill. Sept. 4, 1985) (acknowledging that no derivative liability could be imposed upon a successor without first establishing the predecessor's statutory liability for withdrawal payments).

The plain language of the statute does not support the Plan's argument that ManWeb's continuation of certain work must or should be imputed to Tiernan & Hoover in determining whether Tiernan & Hoover effectuated a complete withdrawal. SubPart B uses the article "the" to identify the employer, clearly referring to the same employer referenced in SubPart A who "ceas[ed] to have an obligation to contribute under the plan." If Congress sought to characterize this situation as a complete withdrawal within the construction industry, it would have included in SubPart B reference(s) to "the employer" or another employer qualifying as that employer's successor. We will not expand on the definition set out in the statute regarding a complete withdrawal as applicable to construction industry employers absent a Congressional directive or controlling precedent.

Other portions of the MPPAA support our conclusion that "the employer," as referred to in SubPart B, does not include a successor. As Judge Shadur wrote in Richland Industries, Ltd., a case in which the claimant argued that a seller and purchaser of assets should be considered a single employer for purposes of computing the liability of the purchaser: "There are explicit statutory provisions defining when successive employers can be considered a single "employer" for purposes of calculating withdrawal liability." 627 F. Supp. at 644. He continued:

> [T]he Act explicitly treats asset sellers and purchasers as separate employers. Section 1384 (in tandem with Section 1383(a)) establishes that an arms' length sale of assets normally occasions a complete withdrawal from the plan by the seller.  That subjects the seller to full withdrawal liability. And the purchaser undertakes no liability at all for the seller's contribution history, unless the purchaser posts a special bond and the seller agrees contractually to assume secondary liability for its contribution history.

Id.

For these reasons, we find that Tiernan & Hoover did not effectuate a complete withdrawal pursuant to §1383(b) and thus, apart from its waiver of the defenses available to it, it would not be subject to withdrawal liability.  Accordingly, prior to the asset purchase, ManWeb had no notice of Tiernan & Hoover's eventual failure to challenge the assessment or the resulting liability.  There being no genuine issue of material fact that ManWeb lacked notice of Tiernan & Hoover's withdrawal liability, it is not liable under the doctrine of successor liability.  The Plan's Motion for Summary Judgment is thus <u>DENIED</u> with regard to its claim against ManWeb, and ManWeb's Motion for Judgment as a Matter of Law is <u>GRANTED</u>.

### Conclusion

For the reasons detailed herein, Defendant ManWeb Services, Inc.'s Motion for Judgment as a Matter of Law [Dkt. No. 104] is <u>GRANTED</u>.  Plaintiffs' Motion for Summary Judgment against All Defendants [Dkt. No. 95] is <u>GRANTED IN PART AND DENIED IN PART</u>.  Specifically, the Plan's Motion is <u>GRANTED</u> with regard to its claim against Tiernan & Hoover, and <u>DENIED</u> with regard to its claim against ManWeb.  As noted above, in addition to the $661,978.00 in assessed withdrawal liability against Tiernan & Hoover, the Plan is entitled to payment of interest, liquidated damages, reasonable attorney's fees and costs in accordance with 29 U.S.C. 1132(g)(2).  The Plan shall submit a proposed computation of these amounts to Tiernan & Hoover within 30 days from the date of this Order.  We urge the parties to attempt to

resolve informally any differences  they may have relating to the computation, but, if such resolution is not possible, Tiernan & Hoover is directed to file its objections to the Plan's computation within fifteen days of the parties' declared impasse.

       IT IS SO ORDERED.


Date:  _09/30/2013_                      _Sarah Evans Barker_

                                SARAH EVANS BARKER, JUDGE
                                United States District Court
                                Southern District of Indiana

Distribution:

Julia E. Dimick
ALERDING CASTOR HEWITT LLP
jdimick@alerdingcastor.com

Scott Alan Kreider
ALERDING CASTOR HEWITT LLP
skreider@alerdingcastor.com

Michael J. Alerding
ALERDING CASTOR LLP
malerding@alerdingcastor.com

Frederick W. Dennerline, III
FILLENWARTH DENNERLINE GROTH & TOWE LLP
fdennerline@fdgtlaborlaw.com

James W. Clark
FLEMING STAGE LLC
james.clark@flemingstage.com

Michael A. Ledbetter
LEDBETTER PARISI SOLLARS LLC
ledbetter@fringebenefitlaw.com

Rachel R. Parisi
LEDBETTER PARISI SOLLARS LLC
rparisi@fringebenefitlaw.com

Rena G. Sauer
LEDBETTER PARISI SOLLARS LLC
rsauer@fringebenefitlaw.com

James H. Hanson
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
jhanson@scopelitis.com

James Thomas Spolyar
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
jspolyar@scopelitis.com